*Jesse (a slave) vs. The State.*

No. 33.—JESSE (a slave) plaintiff in error, *vs.* THE STATE, defendant.

[1.] The Act of 1856, in relation to the qualification, selection and impanneling Juries, is constitutional, and applies to trials for offences committed before its passage.

[2.] Deafness is an infirmity for which, like ordinary sickness, the Court may excuse a Juror without the consent of the prisoner.

[3.] The refusal of the Court to allow a re-examination of a witness, merely to have her testimony taken down, which had been omitted inadvertently—the Court would, no doubt, allow that to be done, if the parties could not agree as to the evidence.

[4.] Witness may be recalled to explain her evidence.

[5.] It is the duty of the Jury, in making up their verdict, to weigh the whole evidence; and in doing this, they may consider the manner of the witnesses in giving their evidence; but manner is not always a safe criterion of the credit due to a witness.

[6.] The fact that a person accused of a crime did not fly, is but an equivocal evidence of his innocence.

[7.] If there be a reasonable doubt resting upon the minds of the Jury, whether the crime charged was committed, they ought to acquit.

[8.] The statement of the effect that a reasonable doubt resting on the mind of the Jury should have on their finding, is not an explanation of what is to be understood by a reasonable doubt.

[9.] Circumstances not in proof cannot be considered by the Jury.

[10.] The Jury cannot go beyond the evidence submitted in the cause, to raise doubts in their minds as to the guilt of the accused.

[11.] No error for the Court to charge the Jury that they are not responsible for the effect of their verdict, where prisoner's Counsel insists on the punishment annexed by law to the officer; to influence the verdict.

[12.] If affidavit of witness, inconsistent with the testimony delivered on trial, be relied on to impeach her, it may be explained and shown to have been given under circumstances not implicative of her character or integrity. (See 4.) And when her evidence is attempted to be impeached by the proof of counter statements under oath, she may be supported by the proof of consistency in her statements.

[13.] A witness who makes an affidavit, which is untrue, without knowing its contents, and having no reason to know them, is not worthy of credit; but not so, if the affidavit is drawn from witness' statements, which are true, but erroneously written by the draftsman.

[14.] No error for the Court to instruct the Jury emphatically in regard to the form of their verdict, if it be not done in a manner to impress the minds of the Jury unfavorably to one of the parties.

Jesse (a slave) *vs.* The State.

Indictment for rape, in Decatur. Tried before Judge ALLEN, June Term, 1856.

Jesse (a slave) was arraigned for trial at said term, upon an indictment containing two counts : one for rape, and the other for an assault with intent to commit a rape.    The parties then being ready, and proceeding to form a Jury to try the case, the first Juror on the panel, John Smith, was called and put directly upon the prisoner, who objected to the mode of putting the Juror on him, insisting that before the Juror could be put on him, the prisoner, it was necessary to present the Juror to the accused, so that objections might be made, as to his competency as a Juror, if any existed ; and that if then no objections should be made, the Sol. General should ask the Juror the questions prescribed by the Act in relation thereto, approved February 28, 1856 ; that the Jury should be selected according to the provisions of that Act.

The Court over-ruled the objection, and held that that Act did not apply to offences committed before its passage, &c. ; to which ruling, prisoner's Counsel excepted.    Prisoner's Counsel then asked the Court to try the Juror's competency. The Court ordered the questions prescribed by Statutes, existing previous to the Act of 1856, to be propounded to the Juror, which he answered affirmatively.    The Court being requested to test the Juror's competency further, the Juror was tested by "triors," according to the law as it existed previous to said Act of 1856.    Two Jurors were thus selected.

A Juror having been sent before the triors, he answered, in response to questions addressed him by prisoner's Counsel, that he had formed and expressed an opinion from what he had heard in relation to the guilt or innocence of the accused ; and from what he had heard, he had a bias or prejudice resting on his mind, for or against the accused.    Counsel for prisoner insisted that the Juror should be set down

for cause, without waiting for the report of the triors. The Court refused the motion, and prisoner excepted.

One John M. Potter was then called as a Juror, and put on the prisoner; having affirmatively answered the statutory questions, he was put on triors, and answered before them, that he had heard a portion of the testimony of Mrs. Patterson before the committing Magistrates, and but little of it; and that he had formed and expressed no opinion from what he did hear; but that the same had made an impression on his mind against the prisoner; he was challenged for cause. The Court refused to allow the challenge for cause, and ordered the triors to examine and report on his competency; he was reported incompetent.

A. S. Curry was then called, and having answered the formal questions negatively, was sent before the triors, and answered, that from what he had heard, he had formed an opinion as to the guilt or innocence of the accused, which was still resting on his mind, though it might be removed by the evidence; he would not say that it would, but thought it could be. Prisoner asked that he be set down for cause at once. The Court refused, and ordered the triors to examine and report on his competency; which was also excepted to. Being reported competent, prisoner's Counsel insisted that notwithstanding the report, the Juror had shown himself incompetent in the presence of the Court, and ought to be adjudged incompetent. The Court over-ruled the objection, and prisoner excepted.

James Lasseter being called, and having answered he had conscientious scruples in regard to capital punishment, the Solicitor General replied aloud, and in the hearing of the panel yet to pass before the accused, "that they then had no use for him, as this was a hanging case."

George L. Earnest, one of the panel, being called up, stated to the Court that he was a little hard of hearing; that if taken as a Juror, he could not well hear the evidence. The Court discharged him, and no objection was made thereto.

The Jury being made up, Counsel for the State then pro-

Jesse (a slave) *vs.* The State.

ceeded to open the case and submit the evidence on behalf of the State.

Mrs. CAROLINE E. PATTERSON, the main witness sworn on the part of the State, examined and cross-examined, recalled on the part of the State, and again cross-examined. Counsel for prisoner proposed to ask the witness some questions not strictly in rebuttal, stating to the Court that by inadvertance, they had neglected to have her answers to (?) similar examination taken down when she was under their cross-examination the night before; and that they desired to ask the questions now in order to have answers thereto taken down. The Court refused, and prisoner excepted.

The evidence having closed, the Solicitor General, whilst addressing the Jury in conclusion, asserted, in the course of argument, that prisoner was of bad and imfamous character. Counsel for prisoner requested the Court to stop the Counsel and correct the statement. The Court interrupted the Solicitor, who insisted that such was the proof, and continued to discuss his bad character, without being checked by the Court, although again appealed to by prisoner's Counsel.

(All that is disclosed in the brief of evidence as to prisoner's character, is this: John C. Patterson re-examined by the State, says—"My wife assigned two reasons for threatening to run Jes off: one was, that his owner did not furnish him with sufficient clothing, and it took up too much of his wife's time in patching and washing for him; the other reason was, that he was of an impudent family of negroes, and he believes his former owners were afraid of him. She had some fears, and believed her own negro woman was more indolent on account of him.")

The like objection was made with the like result, when the Solicitor, commenting on the evidence of Mrs. Patterson, said: "her little girl, eleven years old, was awake and up while the prisoner was in Mrs. Patterson's room, and knew and called out that it was prisoner." Counsel for prisoner denying that such was the proof, and the Solicitor still insisting upon the fact as proven, as a fact identifying the pris-

oner as the person making the assault on the person of Mrs. Caroline E. Patterson.

(The brief of evidence shows Mrs. Patterson's testimony, the only witness who testified on this subject, to be this : Mrs. Patterson, referring to the assault upon her, which she had previously stated to be by the prisoner, on her bed, in her sleeping room, at her house, between midnight and day, goes on to state, "My children awoke and he made his escape into a shed room, but I followed him into the shed room, and I told my daughter to open the door, but she did not. He did not open the door, nor my daughter either, and he turned round and pushed me back into my room ; I turned round and looked at him as he was pushing the windows." In another place she says, "When he (prisoner) left my bedroom, four of my children were awake ; there were two lying on my bed that awoke ; my other children were in the room, and I told my daughter to open the door, but she did not. My children awoke and commenced crying and hollowing, which caused him to leave the bed. When he left my bed I followed close behind through the door into the shed-room adjoining my room, and he pushed me back. When he pushed me back, he went into a window and pushed it open and jumped out." And in the concluding part of her testimony she adds: "When the negro man jumped out of the window, my little girl said, "that looks like Jes.")

It is also charged as error, that "the Solicitor made frequent and repeated diversions from the evidence, in his statements and comments to the Jury, unsupported by the evidence, either directly or inferentially;" to which prisoner objected, without being supported by the Court; and that among other things the Solicitor remarked, that "I call on you, gentlemen of the Jury, this night to make a mark on the slave population, that will curb them in the commission of this dastardly crime that is taking the whole." Again: "that it was necessary for them to make an example of this wretch, (meaning the prisoner,) to protect and defend the honor, and integrity, and character of the County of Deca-

tur, to protect their wives, sisters, and mothers, and daughters from such outrages."

The argument having closed, Counsel for prisoner requested the Court to charge the Jury—

1st. "That if the witness, Caroline E. Patterson, has contradicted herself or sworn falsely, in any material point, that she is not to be believed by them in any particular." This the Court declined to do as requested, but having read the same (said) yes, this is law; but the contradiction must be plain and palpable, and without explanation; and you must be satisfied that witness contradicted herself knowingly and wilfully; and then, if unexplained, the rule would exist, and not till then.

2d. "That if this witness has by so doing, (contradicting herself in a material point,) or otherwise, (as by her manner of testifying,) placed herself in a position not to be believed by them, then they cannot find the prisoner guilty, as there is no evidence to sustain the charge." The Court also refused this charge in the words requested, but read them over and said—yes, gentlemen, this also is true, but you must take it with the same qualifications and instructions as to first point.

3d. "That if the fact that the prisoner did not try to get out of the way; that he remained there for some time, then went home where he was found by the persons in search of him, are circumstances to be considered by the Jury as evidences of his innocence." This the Court refused to charge as requested, but charged the Jury, that these facts, if there were no others; that if they were disconnected from all other circumstances, would be circumstances of his innocence; but as it was, they were to take them as mere badges that might indicate his innocence, if not rebutted or contradicted by other and better evidence.

4th. "That he was then (at the house of Patterson) with his wife, is also to be considered by the Jury as a circumstance in favor of the prisoner's innocence." This the Court

also refused as requested, but added, that they should take and consider that circumstance in the same manner and with the same qualifications indicated by the Court in his charge to 3d request.

5th. "That if there is a reasonable doubt on the mind of the Jury that the crime was not committed as charged by the witness, Mrs. Patterson, then they could not find the prisoner guilty." This request was refused as requested; but after reading the same to the Jury, the Court said, yes, this is a correct principle, and I give it to you in charge; but it is not every doubt that will justify this conclusion; it must be a reasonable doubt; such an one as in the ordinary business transactions of your every day life, would stay you from acting; as would satisfy you that you were wrong; in other words, it must be such a doubt as you could give a reason for if called on.

6th. "That if there is a reasonable doubt on the mind of the Jury, from the evidence and all the circumstances, that the prisoner is the person who committed the offence charged by the witness, Mrs. Patterson, or by the prosecutor, that then they cannot find the prisoner guilty."

7th. "That if there is a reasonable doubt on the mind of the Jury (from any cause) as to the guilt of the prisoner, that then the Jury cannot find the prisoner guilty of the charge." Both of these requests the Court refused to charge as requested; but admitted them as correct principles and gave them in charge, with the same qualifications, restrictions and limitations as those added to 5th request.

The Court then charged the Jury, that "from the argument of Counsel to you, I feel bound to charge you, gentlemen of the Jury, that you are not responsible for the effect of your verdict; that you have nothing to do with: but it belongs to and falls upon a different department. And again: That the witness, Mrs. Caroline E. Patterson, is entitled to credit until she is impeached and disqualified; and that to impeach and disqualify a witness, there must be the joint oath of two witnesses, or the oath of one witness and con-

Jesse (a slave) *vs.* The State.

vincing concomitant circumstances ; and then apply this principle to Mrs. Patterson's testimony. Again : That the joint oath of two witnesses, or the oath of one witness and concurring concomitant circumstances may be rebutted by evidence corroborative of the testimony of the witness attempted to be impeached ; which principle was applied to Mrs. Patterson's evidence. Again : That direct and irrefragable evidence cannot and need not always be produced in criminal cases ; all that is necessary is, that the Jury, whether the proof be positive or presumptive, be satisfied of the defendant's guilt ; that if they believe that the affidavit administered to Mrs. Patterson by John Hutchinson, was not read over to her before she was sworn to it, or that Mrs. Patterson, at the time of taking the affidavit, did not know the contents of the same, that her taking that affidavit did not impeach her testimony or disqualify her as a witness ; that in making up their verdict, as Counsel for the State had abandoned the charge of rape, if they found the defendant guilty, that then, in writing out their verdict, they must find the defendant guilty of an assault with intent to commit a rape ; if not guilty, then, generally, not guilty. But pay attention to me, gentlemen ; I will repeat the form of your verdict again, in case you find him guilty, for I want you to be particular. If you find the defendant guilty, write your verdict, " We, the Jury, find the defendant guilty of an assault with intent to commit a rape." If you do not, then write that you do not find him guilty.

To all which charges, manner of and refusals to charge, prisoner, by his Counsel, excepted, and now assigns the same as error.

R. F. LYON, for plaintiff in error.

Sol. Gen. EVANS, for defendant.

*By the Court.*—McDONALD, J. delivering the opinion.

[1.] This Court, at the Savannah June Term last, in the

case of *Ralph* (*a slave*) *vs. The State of Georgia*, decided
that the Act of 28th February, 1856, in relation to the qual-
ification, selection and impanneling of Jurors, is constitu-
tional, and that it is law in regard to offences committed be-
fore its passage.   It violates none of the constitutional rights
of the people, and is perhaps better adapted to the obtain-
ment of impartial Juries than either the Common Law or
antecedent Statutes.   We, therefore, reverse the decision of
the Circuit Judge on that point.

[2.] The Act does not define deafness as a disqualification
for serving on a Jury.   Nor does it sickness of any descrip-
tion; and yet, it is not error for the Court to excuse a per-
son who is sick, from serving on a Jury; nor can it be to ex-
cuse one who is laboring under the infirmity of deafness.
The Court discharged the Juror without consulting the pris-
oner, and he had a right to do it; but in this case, the pris-
oner did not object, and cannot now say there was error.

[3.] It was in the discretion of the Court to have allowed
the re-examination of Mrs. Patterson; but that the Court
refused to permit it, is no error.   The object was to have her
testimony taken down, which had been inadvertently omit-
ted.   The taking down of the evidence has nothing to do
with the trial of the case.   The verdict of the Jury would be
good if it were entirely omitted.   But the Court would,
doubtless, in all cases, allow evidence to be taken down which
had been omitted by mistake or accident, upon its being re-
duced to writing or stated to the Court; and on disagree-
ment between Counsel, call the witness, not for re-examina-
tion, but merely to state the testimony already given.

[4.] The witness, Caroline E. Patterson, had been exam-
ined, and was recalled to explain her evidence.   If the wit-
ness had committed any errors in delivering her evidence,
she had a right to correct them.   The principal error was
her denial that she had made the affidavit on which the war-
rant was issued.   But that statement seems to be satisfacto-
rily explained.   She had narrated the circumstances to Sam-
uel C. Patterson, who superintended the drawing of the affi-

Jesse (a slave) *vs.* The State.

davit. It was taken from a form book, and when prepared, he said it was unnecessary to read it to her, and it was not read to her. She denies that it was read to her, though the Justice's recollection differs from hers and Samuel C. Patterson's. He thinks it was read over to her. Peter J. Gray, who was present, thinks it was not read to her. In the brief of the evidence, as taken by the examining Magistrates on the return of the warrant issued on that affidavit, Mrs. Patterson is represented as having sworn that " the said boy Jess took up her dress and *attempted* to have sexual intercourse," &c. The Court ought not to have charged the Jury that if Mrs. Patterson had sworn falsely, or contradicted herself in any material point, she is not to be believed in any particular. If she had sworn falsely, *wilfully* and *knowingly*, she would not have been entitled to credit, in any respect. But that was not the request; and the weight of evidence would not justify the inference. She had stated the facts to one of the witnesses who immediately retired with the Magistrate to write the affidavit, which was instantly prepared and brought to her; and she had a right to suppose that it was drawn in accordance with her statements.

The affidavit for a warrant was taken from a form book, as stated, and contains the direct and positive charge of rape. On the next day, when the affiant, Caroline E. Patterson, was examined before the committing Magistrates on the warrant issued against Jess, her testimony was committed to writing; the copy of the written evidence contains no such charge; and on a further examination before four Magistrates, (and when or why this examination was taken, does not appear,) she is represented as swearing to an *attempt* only. Her testimony on this point is consistent, throughout, when it is taken down as she delivers it, and is only contradicted by an affidavit which the weight of evidence shows was not read to her, and which seems not to have been written in accordance with her statements. It was natural enough for her to have denied making an affidavit which contained matter that she knew she had not authorized to be

put in one to be drawn for her. She seems not to be conversant with writing, and had not, probably, written enough to acquaint herself with her own signature; and may, therefore, have placed her denial of it, more on the matter it contained than on the hand-writing; for although she had examined, she did not seem to know that Mr. Hutchinson had signed it, and immediately declared, that if it was the paper he signed, she had signed it.

[5.] The charge of the Court was quite as favorable to the prisoner, on the second request of his Counsel, as his case warranted.

The first part of this request has already been considered, and the second, as to the witness' manner of testifying, whatever it may have been, would not warrant a charge of acquittal. It is true, that in making up their verdict, the Jury have a right, and it is their duty, to weigh the whole evidence; and in doing that, to regard the witness' manner. But the manner is not always a safe criterion for judging of the credit of a witness. Difference of temperament, and habits of life and business, may produce a difference of manner in the most honest and upright witnesses, when put on the stand in a public and crowded court-room. Imperturbable depravity might be able to make there a greater apparent exhibition of candor and sincerity, than the most scrupulous but disconcerted integrity.

[6.] The Court charged, substantially, as was asked in the third request. The Jury were told that the evidence relied on to establish the innocence of the prisoner, might be regarded as badges of his innocence, if not contradicted by other and better evidence. This was, in effect, telling the Jury that they ought to be controlled by the weight of evidence.

As flight is not always evidence of guilt, or, at least, in some cases, very slight evidence of it; so, the fact that a person accused of a crime has not fled, is very equivocal evidence of his innocence.

The Court ought not to have charged the Jury as asked in

the fourth request, even with the qualification. The circumstance relied on in that request, as tending to establish the innocence of the prisoner, we consider as not of the slightest value for that purpose.

[7.] The Court did charge as requested fifthly, and it was right that he should; it was his duty, also, to explain what is meant by reasonable doubt; but we think there was error in his explanation, and in the instances put by way of illustration.

[8.] The explanation was rather as to the effect a reasonable doubt should have on their finding, than as to the nature or kind of evidence that should leave a reasonable doubt resting on the mind. There is no question as to the effect of a reasonable doubt. When the mind of the Jury cannot come to a satisfactory conclusion on the issue before them, from the evidence properly considered, they should leave the parties as they found them. This is the rule both in civil and criminal cases, but a greater caution should be observed in coming to a conclusion, when life or liberty are involved in the issue; and this constitutes the difference. But a doubt cannot satisfy the mind of the innocence of a party, more than it can of his guilt; nor can *a doubt satisfy* the mind that it would be wrong to convict. But the existence of a doubt, the absence of that amount and quality of evidence which ought to satisfy the impartial and unprejudiced judgment of a reasonable and conscientious man of the guilt of the accused, would render it improper to convict. Doubt ceases when there is conviction. There can be no conviction where there is doubt. But a man may be satisfied, that where there is an equipoise in his mind, after putting in the balance all the circumstances, *pro* and *con,* a particular measure or project; or in other words, where there is a doubt, it would be wrong for him to act. But this explanation does not define or describe a reasonable doubt. It is no more than the abstract proposition, that a man's judgment ought to be convinced before he acts. The charge requested was, "if there was a reasonable doubt on the mind of the Jury, that the

crime was not committed," &c.   If the crime was not com-
mitted, the prisoner could not be guilty.   If the evidence
submitted *to* the Jury was unsatisfactory to them that the
crime charged in the bill of indictment had been committed;
(not by Jess, but by any one ;) if their minds were in equi-
librio on that point, and their judgments were not satisfied
by the evidence, then there was a reasonable doubt on their
minds as to the proof of the crime, without which the priso-
ner could not be guilty.

It is not the *doubt* that *satisfies*, but it is the insufficiency
of the evidence, in some of the respects in which it may be
proper to consider it, that leaves the mind in such doubt as
to render it improper to act upon it.   If the mind is wavering,
unsettled, *cannot be satisfied*, from the evidence, whether the
crime was committed at all, it would be wrong to convict.
But the Jury ought never to be left to infer or to conjecture
that they can create for themselves a doubt and act upon it,
for the exculpation of the guilty.   A thousand fancies may
suggest themselves to skeptical minds, to create unsubstan-
tial doubt—as, that witnesses may not remember accurately,
may be mistaken, may swear falsely, &c. &c. &c.   Such
things are not allowable.   Witnesses must be believed, unless
they be impeached in some of the modes which the law de-
clares sufficient to throw suspicion on their testimony.   If
their evidence be *in no manner* impeached, it is entitled
to implicit belief, and the Jury which disregards it incurs the
guilt of wilful or reckless error.

[9.] The Court ought not to have charged the Jury as
asked in the sixth request.   The Jury was not authorized to
consider circumstances not in proof.   If in proof, they were
evidence.

[10.] We say that neither was there error in the Court
in refusing to charge as asked in the 7th request.   The Jury
ought not to have received any instructions, that would have
allowed them to go out of the evidence to search for a doubt
on which to acquit the prisoner.

It is unnecessary to consider the errors growing out of ex-

ceptions to the argument of the Solicitor General, made in the Court below. It may not be amiss, however, to observe, that while the safety of society requires the faithful prosecution of offenders against the laws, the State does not ask their conviction but upon a calm and dispassionate investigation of the charges against them.

[11.] There is no error in the charge of the Court to the Jury, that they were not responsible for the effect of their verdict. Such a charge may become proper when the Counsel for the accused puts his defence not upon the evidence, but on the punishment prescribed by law for the offence for which he is indicted.

[12.] The charge of the Court was right, in respect to the credit due to Mrs. Patterson's evidence. It was given, of course, in reference to the mode of impeachment resorted to in this case. What has already been said in regard to the affidavit to obtain the warrant, need not be repeated here; and the weight of evidence is corroborative of the balance of her testimony.

[13.] The charge of the Court as to the effect of an affidavit taken by a witness, which was not read to her, and the contents of which she did not know at the time, taken apart from all other evidence, or there being no other evidence to that point, is not correct.

For a witness who makes an affidavit which is untrue, without knowing its contents, and having no reason to know them, is not entitled to credit; but a witness who states his evidence to the writer of the affidavit, and who swears to its contents when drawn, without reading or hearing it read, is not guilty of perjury, though the facts be not truly set out in the affidavit; for the witness, in such case, has a right to believe that the affidavit was drawn according to his statements. The Court charged, in this case, under the evidence given; and we think, for reasons already set forth, that there was no error.

It is not alleged in the record that the emphasis and repe-

tition of the closing part of the charge, in regard to the form of the verdict of the Jury, were such as were calculated to. impress the mind of the Jury unfavorably to the prisoner.. There were two counts in the indictment: one for rape; the other for attempt to commit rape. It was proper that the attention of the Jury should have been called directly to the fact, that the count in the bill of indictment for rape had been abandoned, and that they went to trial on the count for attempt to commit rape, exclusively; and that their verdict should be, guilty of that particular offence, and not for the other, if they should find a verdict of guilty.